782 F.2d 710
 54 USLW 2423, 1986-1 Trade Cases 66,940,
4 Fed.R.Serv.3d 151
 UNION CARBIDE CORPORATION, Petitioner,
v.
U.S. CUTTING SERVICE, INC., et al., Respondents.
In re INDUSTRIAL GAS ANTITRUST LITIGATION.
Appeal of UNION CARBIDE CORPORATION.
UNION CARBIDE CORPORATION, Petitioner,
v.
The Honorable Susan GETZENDANNER, Respondent.
 Nos. 85-2926, 85-2965 and 85-3039.
 United States Court of Appeals,
Seventh Circuit.
 Submitted in Nos. 85-2965
and 85-3039 Dec. 9, 1985.
 Argued in No. 85-2926 Dec. 17, 1985.
Decided Jan. 28, 1986.
 
 H. Blair White, Sidley & Austin, Chicago, Ill., for petitioner.
 Michael J. Freed, Much, Shelist, Freed, etc. Chicago, Ill., for respondents.
 Before BAUER, POSNER, and FLAUM, Circuit Judges.
 POSNER, Circuit Judge.
 
 
 1
 We have consolidated for decision two interlocutory appeals (alternatively pleaded as petitions for mandamus, see 28 U.S.C. Sec. 1651) filed by Union Carbide Corporation, a defendant in a large antitrust class action (now in the discovery stage in the district court) brought on behalf of buyers of industrial gases. In the first (Nos. 85-2965 and 85-3039), Union Carbide is trying to appeal from an order by Judge Getzendanner refusing to allow it to interview persons employed by members of the plaintiff class. Because the class is so large (it has 172,000 members), the order prevents Union Carbide from interviewing many potential witnesses--notably, former employees of Union Carbide now employed elsewhere. About the merits of Judge Getzendanner's order we shall have nothing to say. We do not think the order is appealable or mandamus a proper substitute for an appeal. The general and very salutary rule is that discovery orders are not appealable until the end of the case. See, e.g., Marrese v. American Academy of Orthopaedic Surgeons, 726 F.2d 1150, 1157-58 (7th Cir.1984) (en banc), rev'd on other grounds, --- U.S. ----, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985); 8 Wright & Miller, Federal Practice and Procedure Sec. 2006 (1970). There is a safety value: if the party disobeys the order and is punished for contempt or by the entry of final judgment or by any other sanction that has the character of a final decision, he can appeal from that. United States v. Ryan, 402 U.S. 530, 532-33, 91 S.Ct. 1580, 1581-83, 29 L.Ed.2d 85 (1971); Marrese v. American Academy of Orthopaedic Surgeons, supra, 726 F.2d at 1157. But Union Carbide has not yet attempted to avail itself of this route.
 
 
 2
 It argues however that this case is special because it involves a question under the First Amendment. It is true that in free-speech cases interlocutory appeals sometimes are more freely allowed, and writs of mandamus sometimes more freely issued, than in other types of case, especially where the interlocutory order can be characterized as imposing a "prior restraint" on speech or the press. See, e.g., Chase v. Robson, 435 F.2d 1059, 1062 (7th Cir.1970) (per curiam); In re San Juan Star Co., 662 F.2d 108, 113 (1st Cir.1981). It is also true that an order limiting communication between named plaintiffs (and their lawyers) and members of the plaintiff class was invalidated on First Amendment grounds in Gulf Oil Co. v. Bernard, 452 U.S. 89, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981). The present case is different, however. Without meaning to prejudge the merits of Union Carbide's constitutional challenge, we note that the limitation here is on communications with an adversary, that such a limitation grows out of the established principle that a lawyer for one party is forbidden to communicate directly with the opposing party, and that Union Carbide is seeking not to communicate its own views but merely to question witnesses. Cf. Resnick v. American Dental Ass'n, 95 F.R.D. 372, 376-77 (N.D.Ill.1982). The threat to free speech is not so palpable as to warrant a departure from the usual principle of finality that governs federal appeals. Even more clearly, Union Carbide's non-constitutional challenge to the order (that the judge misinterpreted the provision of the Code of Professional Responsibility that forbids lawyers to contact an opposing party directly) cannot be appealed at this time.
 
 
 3
 Union Carbide's other challenge is to Judge Getzendanner's denial of its motion that she recuse herself from the case. This challenge fits within an exception to the final-judgment rule. A judge's refusal to recuse himself in the face of a substantial challenge casts a shadow not only over the individual litigation but over the integrity of the federal judicial process as a whole. The shadow should be dispelled at the earliest possible opportunity by an authoritative judgment either upholding or rejecting the challenge. In recognition of this point we have been liberal in allowing the use of the extraordinary writ of mandamus to review orders denying motions to disqualify. See, e.g., Pepsico, Inc. v. McMillen, 764 F.2d 458, 460 (7th Cir.1985); SCA Services, Inc. v. Morgan, 557 F.2d 110, 117-18 (7th Cir.1977) (per curiam); see also In re IBM Corp., 618 F.2d 923, 926-27 (2d Cir.1980); In re United States, 666 F.2d 690, 694 (1st Cir.1981); 9 Moore's Federal Practice p 110.13 (2d ed. 1985).
 
 
 4
 Of course in frivolous and even routine cases in which a party challenges the judge's refusal to recuse himself, mandamus will be denied--with sanctions, if the petition for mandamus is frivolous. But where a serious question is raised, we shall interpret generously our power to issue the writ, in order that we may lay the question to rest at the earliest possible time. We therefore need not decide the difficult question whether a ruling on disqualification can ever be certified for an immediate appeal under 28 U.S.C. Sec. 1292(b), as Judge Getzendanner attempted to do here.
 
 
 5
 There is another point. We have held, in part because of the importance "of preventing injury to the public perception of the judicial system before it has a chance to occur," that mandamus is the only method of correcting a judge's erroneous refusal to recuse himself under 28 U.S.C. Sec. 455(a), which requires a judge to recuse himself "in any proceeding in which his impartiality might reasonably be questioned." United States v. Balistrieri, 779 F.2d 1191, 1205 (7th Cir.1985). As it happens, one of Union Carbide's grounds for recusal of Judge Getzendanner is based on section 455(a); and it is so closely related to the company's section 455(b) ground that both should be decided together, which can only be done in this mandamus proceeding.
 
 
 6
 The recusal issue, unique in our experience, arises as follows. The suit was filed in July 1980 and a few months later assigned to Judge Getzendanner, who two and a half years later, in February 1983, married a man whose self-managed retirement account happened to contain some $100,000 worth of stock of IBM and Kodak. The judge had no reason to think that her marriage would have any effect on the propriety of her continuing to preside over the case. Neither IBM nor Kodak were named plaintiffs; nor would it have seemed likely to a person without a technical background--a person who did not know for example that liquid nitrogen is used by both companies for supercooling in various technical processes--that either company would be a member of the plaintiff class, limited as it is to buyers of oxygen, nitrogen, and argon. There was at the time no list of class members. In May 1984 and then again in May 1985 Judge Getzendanner in her required annual financial disclosure statements (28 U.S.C. App. Secs. 301 et seq.) disclosed her husband's stock interests. Not until July 1985 did Union Carbide move the judge to recuse herself, pointing out that IBM and Kodak had in fact bought industrial gases from the defendants during the period covered by the complaint. The motion was based on 28 U.S.C. Sec. 455(b), which provides (so far as pertinent here) that a federal judge "shall disqualify himself ... [where] (4) He knows that he ... or his spouse ... has a financial interest ... in a party to the proceeding." The statute defines "financial interest" as "ownership of a legal or equitable interest, however small." 28 U.S.C. Sec. 455(d)(4).
 
 
 7
 Judge Getzendanner immediately ceased ruling on any motions in the case while the parties briefed the issue whether the statute would be violated if her husband sold the stock in his retirement account. (All concerned agree that an unnamed class member is a "party" under the statute.) During this period all motions were referred to a magistrate or another judge. After the issue was briefed Judge Getzendanner held that she could properly resume control of the case if her husband sold the stock. He did, incurring a brokerage fee of $900, but no capital gains tax, because the retirement account is tax-free; and he invested the proceeds in a money market fund. Union Carbide argues that the sale did not cure the mandatory disqualification of section 455(b) and, if it did, still Judge Getzendanner's continuing to preside in the case violates section 455(a).
 
 
 8
 What makes the case unusual is the unlikely confluence of a class action, a judge's marrying pendente lite, and a tax-free retirement account. If Eastman Kodak and IBM had been named plaintiffs, Judge Getzendanner would have known in February 1983 (when she got married), or at the latest in May 1984 when she filed her financial disclosure form, that she had a financial interest in a party. If she had owned the stock when she became a judge, the parties might have discovered early on that she had an interest in a potential class member. And if her husband had not owned the stock in a tax-free retirement account he probably would not have been willing to sell it and incur a capital gains tax (assuming the stock had appreciated since he had acquired it), in which event Judge Getzendanner would unquestionably have had to recuse herself. We must decide whether this most unusual case is within the purview of either subsection (a) or subsection (b) of section 455. We start with (b).
 
 
 9
 The purpose of (b) is to establish an absolute prohibition against a judge's knowingly presiding in a case in which he has a financial interest, either in his own or a spouse's (or minor child's) name. Before the statute was passed judges did not recuse themselves in such cases unless the interest was so large that a reasonable person might think it could influence the judge's decision. This standard was too nebulous--not least from the judge's standpoint--and Congress replaced it by a flat prohibition. Although the prohibition results in recusal in cases where the interest is too small to sway even the most mercenary judge, occasional silly results may be an acceptable price to pay for a rule that both is straightforward in application and spares the judge from having to make decisions under an uncertain standard apt to be misunderstood. See H.R.Rep. No. 1453, 93d Cong., 2d Sess. 2 (1974).
 
 
 10
 It is not apparent however whether the statute covers the situation where the judge had a financial interest in a party, without knowing it; divested himself of the interest as soon as he discovered it; and made no rulings between the date of discovery and the date of divestment. When Judge Getzendanner discovered in July 1985 that she had a financial interest in a "party" she immediately suspended her involvement in the case. Although the case was not formally reassigned to another judge, any matters requiring a judicial ruling were referred to other judges; it was as if she had recused herself. Then however her husband sold the stock and she resumed control of the case. It was as if she had been reassigned to it. And when reassigned she no longer had a financial interest in it. Since the statute forbids only the knowing possession of a financial interest, since Judge Getzendanner relinquished control of the case as soon as she found out about the financial interest, and since she did not resume control until the financial interest was eliminated, at no time was she in literal violation of the statute.
 
 
 11
 We must of course consider the purpose as well as the bare words of the statute. But the purpose as we have said is just to make sure that judges do not sit in cases in which they have a financial interest, however small. Judge Getzendanner has no financial interest in this case. If she were to rule in favor of the plaintiffs it could not put a nickel in her pocket, because neither she nor her husband own securities of any member of the plaintiff class. Before she discovered she had a financial interest, she could have had no incentive to favor the plaintiffs; when she knew she had such an interest, she made no rulings in the case; now, when she has no interest, she cannot enrich herself by favoring the plaintiffs. The statutory purpose would not be served by forcing her to recuse herself. It is no surprise that the legislative history contains no indication that Congress would have wanted a judge to recuse himself in such a case.
 
 
 12
 To hold that Judge Getzendanner is violating section 455(b) might have the practical effect--as candidly acknowledged by Union Carbide's able counsel--of disqualifying from presiding over class actions a large fraction of the federal judges in the United States. Many, probably most, federal judges (though, as it happens, no members of this panel) own, either directly or through spouse or children, securities in individual corporations (section 455(b) does not apply to ownership of shares of mutual funds, see 28 U.S.C. Sec. 455(d)(4)(i)). In many class actions the full membership of the class is unknown until the litigation is far advanced. Prudence might therefore require, if Union Carbide's position on recusal of Judge Getzendanner were sustained, that all judges owning securities of individual companies recuse themselves from any class action in which the plaintiff class included companies. Class action judges would be drawn from the subset of judges that happen not to own such securities. Such broad-scale disqualification is an unlikely purpose to impute to Congress in passing section 455(b). Admittedly, it may happen anyway, when a judge or spouse chooses not to sell stock (because of capital gains tax) upon discovering that he has a financial interest in a class member.
 
 
 13
 In matters of judicial ethics we are bound to give some weight to the view of the committee of judges that the Judicial Conference of the United States has established to advise federal judges on ethical questions. The Advisory Committee on Codes of Conduct of the Judicial Conference of the United States wrote to Judge Getzendanner advising her that her husband's sale of the stock had removed her disqualification. The Committee was not interpreting the statute as such but it was interpreting the identical language as it appears in the Code of Judicial Conduct for United States Judges. See Canon 3C(1)(c). Although the Committee did not issue a formal advisory opinion, this was unnecessary, since all it was doing was applying to Judge Getzendanner's situation its previous Advisory Opinion No. 69 (Oct. 15, 1981), in which it had concluded that disposing of a disqualifying interest when it surfaces after the judge has been sitting on the case for some time would remove the disqualification and permit the judge to continue to sit.
 
 
 14
 We conclude that section 455(b) does not require Judge Getzendanner to recuse herself in this case. In so holding, we do not mean to endorse sale as a cure for disqualification in all cases. Section 455(b) is only one node in the network of statutory and nonstatutory ethical principles that control the conduct of federal judges. All we do by holding section 455(b) inapplicable is bounce the recusal issue into other and more flexible legal and ethical provisions, such as 455(a), which requires recusal where the judge's impartiality could reasonably be questioned; and to that subsection let us now turn. Here the issue is whether "an objective, disinterested observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt that justice would be done in the case." Pepsico, Inc. v. McMillen, supra, 764 F.2d at 460. Union Carbide's argument is that by having to pay $900 in brokerage fees and giving up potential future appreciation in the value of the stocks, Judge Getzendanner might be sore at Union Carbide; or, at least, that a reasonable person might think she would be sore, for Union Carbide does not suggest that she really is so petty as to want to retaliate against it for exercising its legal right to seek recusal of a judge on colorable grounds.
 
 
 15
 Union Carbide has failed to present evidence that would enable the financial impact on Judge Getzendanner and her husband of the sale of the stock even to be evaluated. Setting the matter of the brokerage fee to one side for a moment, all Union Carbide has shown is that in the five weeks between the sale of the stock and the filing of Union Carbide's brief in this court the value of the stock increased by about 3 percent, but that because Judge Getzendanner's husband invested the proceeds of the sale in a money market fund the proceeds did not appreciate. The comparison is unsound. If Judge Getzendanner's husband had wanted to remain in the stock market he would have invested the proceeds in a mutual fund, and the proper comparison would then be between the mutual fund's performance and that of the stocks that were sold. It is true that the usual mutual fund holds a diversified portfolio of securities, and therefore the value of the fund's shares fluctuates less than that of individual securities; so switching to a mutual fund might have sacrificed some appreciation if the two stocks that were sold from the retirement account turned out to be high-flyers. But the record contains no comparison between the performance of the two stocks and the performance of any mutual fund or of some composite index of mutual funds. It is possible of course that some way down the track in this protracted litigation IBM or Kodak will do splendidly and someone will think that maybe Judge Getzendanner is gnashing her teeth because her husband had sold that stock under pressure, as it were, from Union Carbide, and is spoiling for revenge. But it is one thing to assume that judges are human beings with the usual human emotions and another to attribute to them a malevolent, a calculating, vindictiveness. As a matter of fact, that Judge Getzendanner's husband put the proceeds of the sale of the stock into the money market rather than into a mutual fund suggests that he may have wanted to get out of the stock market anyway, in which event the cost of divestiture to him may have been zero.
 
 
 16
 The $900 brokerage fee is too small to warrant a reasonable person's concluding that Judge Getzendanner may be harboring a grudge against Union Carbide. Remember that for these purposes the reasonable person is assumed to know all the publicly available facts bearing on the issue of recusal; to know that a federal district judge in 1985 had a salary of $78,700 a year, that Judge Getzendanner's husband is a partner in one of the largest law firms in Chicago, that $900 is less than one percent of the proceeds of the sale of the stock, and that the fee would have been incurred anyway as soon as the husband decided to turn over the stock in the retirement account, as he might have done at any time. Here we point out that not only was the account not diversified (and Judge Getzendanner's financial disclosure statements suggest that the couple's other assets do not make their total holdings well diversified), but most financial planners believe that tax-free assets should be invested in interest-paying securities rather than in common stock. Part of the gain from owning common stock is the favorable tax treatment of capital gains compared to ordinary income (including interest); and to maximize that gain requires investing one's taxable rather than tax-free assets in stocks. We are not trying to provide financial advice but merely pointing out how entirely speculative is any suggestion that the $900 was a cost actually incurred because of the motion to disqualify Judge Getzendanner.
 
 
 17
 If Judge Getzendanner's husband had had to pay capital gains tax the appearance of impropriety from her continuing to preside in the case would be greater; and likewise if she had had reason to know before July 1985 that she had a financial interest in a party to the lawsuit. But as we said before, this is an extremely unusual case and we do not think a reasonable person would conclude that Judge Getzendanner's continuing to preside would impair Union Carbide's right to trial before an impartial judge. There is not the slightest indication that she has in fact any partiality in this matter.
 
 
 18
 It should not go unmentioned that Union Carbide may have waited too long to move to recuse Judge Getzendanner. Although her husband's ownership of shares of stock in IBM and Kodak was a matter of public record in May 1984, Union Carbide waited till July 1985 to file the motion. Its counsel advises us that he was reluctant to move to recuse the judge and did so only at his client's insistence. The client evidently was distressed by some rulings made by Judge Getzendanner in the interim. This is not a good reason for delay, at least where the ground for disqualification is merely an appearance of partiality. See, e.g., Potashnick v. Port City Construction Co., 609 F.2d 1101, 1115 (5th Cir.1980); Delesdernier v. Porterie, 666 F.2d 116, 121 n. 3 (5th Cir.1982); cf. United States v. Murphy, supra, 768 F.2d 1518, 1539 (7th Cir.1985). Although SCA Services, Inc. v. Morgan, supra, 557 F.2d at 117, holds that there are no time limits on motions to disqualify under 28 U.S.C. Sec. 455, this position has been uniformly rejected in the other circuits. See United States v. Murphy, supra, 768 F.2d at 1539, and cases cited there. Murphy questions it and Balistrieri, cited earlier, undermines it by stressing the importance of promptly raising any ground for questioning the judge's impartiality. But in view of our other grounds for rejecting Union Carbide's argument for recusal under section 455(a), we have no need to decide whether this holding of Morgan should be reconsidered.
 
 
 19
 The appeals are dismissed; treating them as petitions for mandamus, we deny them. No costs in this court.
 
 
 20
 FLAUM, Circuit Judge, concurring in part and dissenting in part.
 
 
 21
 While I concur in the majority's decision regarding the discovery order, I respectfully dissent from its treatment of the recusal issue because of my conclusion that a rule permitting district judges to "cure" section 455(b) disqualification by divestiture countermands congressional intent. Thus, despite the district judge's concerned and highly responsive handling of the situation in this case, I would issue a writ of mandamus directing the judge to recuse herself.
 
 
 22
 The majority does not contest the fact that Judge Getzendanner was in a state of disqualification under section 455(b) when she became aware that her husband had a financial interest in two members of the plaintiff class. Nevertheless, the majority reasons that the judge cured or removed this state of disqualification by causing the interest to be sold. The majority concludes that the issue of disqualification then "bounced" out of section 455(b) and into section 455(a). I cannot adopt this position because section 455(b) is absolute in language and contains no provision for cure. Moreover, I read that language, and the intentions of Congress, to indicate that section 455(b) is the sole provision of the statute applicable to problems of financial interest and that analysis of this kind of problem under section 455(a) therefore is precluded.
 
 
 23
 The applicable provision of 455(b) mandates that the judge "shall disqualify" himself when he knows that he "has" a financial interest. The statute does not provide a "sell or disqualify" option, as Judge Getzendanner herself noted in her thoughtful analysis. Through a deft use of verb tenses, however, the majority suggests that Congress left open the possibility for cure by divestiture because once a judge learns of a financial interest and sells it, he no longer "has" the interest; rather the judge "had" an interest. The majority's only proviso is that after the judge knows of the interest, he must sell before making any rulings in the case. This interpretation involves too much manipulation of the statutory language. A straight-forward reading of the statute would suggest that at the time a judge is made aware of a disqualifying interest, he falls squarely into the mandatory directives of section 455(b). Read this way, it appears that the lack of any specific mention in 455(b) of divestiture is due to Congress's recognition of the fact that 455(b) encompasses every conceivable situation in which divestiture is relevant, since at the point at which the judge knows that he "has" an interest, the section directs the judge to step down. Thus, the language of section 455(b) operates as an insurmountable barrier and precludes any analysis under the more "flexible" provisions of section 455(a).
 
 
 24
 Moreover, an examination of the intent underlying section 455(b) makes this interpretation compelling because it reveals that Congress desired to rid the statute of flexibility where financial interests are concerned. The central flaw in the majority's approach is that the cure rule resurrects the "substantiality of the financial interest" inquiry that Congress expressly removed from the statute in 1974. As the majority acknowledges, the congressional amendment of section 455 in 1974 changed the threshold for financial disqualification from a "substantial interest" to "ownership of a legal or equitable interest, however small." For non-financial interests, however, substantiality remained the trigger for recusal. The House Judiciary Committee explained at the time that "by setting specific standards [for financial disqualification], Congress can eliminate the uncertainty and the ambiguity arising from the language in the existing statute and will have aided the judges in avoiding possible criticism for failure to disqualify themselves." H.R.Rep. No. 1453, 93d Cong. 2d Sess. (1974). Thus, it would appear that Congress intended where financial interest is raised as the ground for disqualification, that judges will not have the duty or the opportunity to decide the matter based on the significance of the interest: if financial interest exists, the judge must recuse himself.
 
 
 25
 The congressional decision to establish a unique per se rule for situations involving financial interest would clearly indicate that divestiture cannot cure disqualification by avoiding the proscription of section 455(b). As an analysis of the majority's opinion reveals, such a cure approach entangles the district judge--and the judges sitting on review--in the prohibited exercise of weighing the substantiality of the financial interest. The majority's rule engrafts the once-vanquished substantiality standard onto the statute via section 455(a). Under the auspices of that section, the majority would have a district judge determine the propriety of his continued presence in a case by assessing whether the cost of divestiture is so great as to cause a "reasonable person" to question the judge's impartiality. This inquiry requires a judge to estimate not only the actual costs of divestiture--including brokerage fees, tax consequences, and so forth--but also the relative costs, derived by comparing actual costs to the value of the asset and to the financial worth of the judge and, if relevant, the judge's spouse. At some level, presumably, these relative costs are so significant that the judge must step down because a reasonable person would suspect him of being "sore" at the party that had sought recusal. This results in nothing more than the pre-1974 substantiality test in another guise: a judge under both the pre-1974 scheme and the rule created today by the majority must decide a recusal issue by evaluating whether the size of the financial interest--or the cost of divesting it--is substantial relative to his entire worth. While such an analysis may be laudable in its search for economies of judicial manpower and administration, I am convinced that Congress enacted section 455(b) to eliminate this sort of analysis. Thus, I must conclude that the majority's rule violates the mandate of the statute.
 
 
 26
 Turning to the majority's statement that under a per se rule class actions such as the one here would require broad-scale disqualifications, I cannot share in its pessimism. First, we have no data before us suggesting that "many, probably most," federal judges own securities that potentially could disqualify them in class actions. Moreover, judges wishing to avoid the possibility of disqualification can utilize "blind" trusts or invest in mutual funds, which were specifically exempted by Congress from the ambit of section 455(b). Finally, I can only assume that in the event that adherence to the per se rule creates problems of judicial administration, Congress will modify the statute. Until Congress so acts, however, we are limited by its statutory directives.
 
 
 27
 The majority concludes its discussion by suggesting that Union Carbide may have waited too long after it learned of the disqualifying interest before moving the judge to recuse herself, "at least where the ground for disqualification is merely the appearance of partiality." Although I am also concerned about such a delay, I believe that with respect to section 455(b) disqualification, Congress's unequivocal language means that parties cannot waive financial disqualification, even by their own misconduct or inaction. Because attorneys are officers of the court, as well as advocates, they have a responsibility to bring recusal motions at the earliest opportunity. Section 455(b) serves to protect the appearance and propriety of the judicial system, not just the interests of the immediate parties to the suit. Motions under this statute should not be used as part of litigation strategy, and if parties are intentionally dilatory in making 455(b) motions, appropriate sanctions should be considered.