**Jonathan GRAY; Rocco Marciano; and Richard J. Sabatini, Plaintiffs,**

**v.**

**Walter O. BRIGGS; Janney Montgomery Scott, Inc.; and Thomas G. Amon, Defendants.**

**No. 97 Civ. 6252(DLC).**

United States District Court, S.D. New York.

April 7, 1999.

Steve S. Efron, New York City, for Sabatini.

Jonathan W. Gray, Cowan, Debaets, Abrahams & Sheppard, LLP, New York City, pro se and for Marciano.

Christopher A. Parlo, Steven I. Locke, Morgan, Lewis & Bockius LLP, New York City, for Briggs and Janney Montgomery Scott, Inc.

Paul Corcoran, John T. Brennan, Davis & Gilbert LLP, New York City, for Amon.

## OPINION

COTE, District Judge.

This action has risen out of the rubble of an ill-fated law partnership between plaintiff Richard Sabatini ("Sabatini") and defendant Thomas Amon ("Amon"). Sabatini, and plaintiffs Jonathan Gray ("Gray") and Rocco Marciano ("Marciano"), a former associate and paralegal of the firm respectively, assert violations of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001, *et seq.*, by defendants Amon, Walter Briggs ("Briggs"), and Janney Montgomery Scott, Inc. ("Janney"). Defendants Briggs and Janney have moved for summary judgment on plaintiffs' claims against them, or in the alternative, summary judgment on their cross-claim against Amon and counter-claim against Sabatini. The plaintiffs oppose the motion. Defendant Amon opposes his co-defendants' motion, except as to the plaintiffs' claims under Section 406, the allegedly "prohibited transactions." Briggs and Janney have further moved to exclude the report and testimony of the plaintiffs' expert, Robert Lau ("Lau"). Amon joins in this motion to exclude Lau's report and testimony, and also seeks to preclude the plaintiffs from offering any evidence concerning two withdrawals of assets that they allege violated ERISA. For the reasons set forth below, the Briggs' and Janney's motion for summary judgment is granted in part and denied in part, and their motion to exclude Lau's report and testimony is granted in part.

Amon's motion to preclude the introduction of evidence concerning the two withdrawals of assets is granted.

## BACKGROUND

Except as otherwise noted, the following facts are undisputed.

### 1. The Plans

In 1990, Sabatini and Amon agreed to open a law office called Amon & Sabatini in Manhattan, sharing space and expenses but not clients or profits. In 1992, Amon and Sabatini retained a law firm to establish two employee benefit plans, the Amon & Sabatini Pension Plan ("Pension Plan") and the Amon & Sabatini Profit–Sharing Plan ("Profit–Sharing Plan") (together, "the Plans"). Amon and Sabatini were designated as the sole trustees of the Plans, and each could act individually on behalf of the Plans.

On or about April 9, 1992, Amon contacted Briggs, a securities broker at Janney, to obtain investment and brokerage assistance from Briggs and Janney concerning the assets of the Plans. Briggs asserted in his deposition that Amon told him at that time to pursue a strategy of "aggressive growth" in his investments for the Plans, while Amon denies giving such instructions. After this discussion, $40,000 of the Plans' assets were transferred to Janney. No written agreements document the relationship between the Plans and Briggs and Janney. No written accounting was provided to Briggs or Janney indicating the proportion of the Plans' assets held and managed by those defendants.

Briggs provided regular investment advice to Amon concerning the Plans, and Briggs invested the Plans' assets on numerous occasions. Indeed, Amon followed all of Briggs' investment advice concerning the Plans' assets without exception. The parties dispute whether Briggs was aware that the Plans' investments were made entirely upon his advice, and whether Briggs acted unilaterally in investing assets of the Plans at any time. Briggs asserts that he had no authority to act without consent of a trustee, and never did so act. Amon testified, however, that despite the absence of such express authority, Briggs invested assets at times without first seeking his consent, and that Amon relied on Briggs to provide advice and to invest in that fashion. In any event, Briggs and Janney sent a confirmation slip to Amon & Sabatini after each investment transaction, as well as monthly account statements that documented all investment transactions for the Plans. Neither Amon nor Sabatini ever canceled such a transaction. Briggs testified, and no other party disputes, that he believed Amon's directions concerning the Plans to have been given with Sabatini's knowledge and consent.

Sabatini did not take an active role in managing or choosing investments for the Plans, and did not consult with Amon regarding the investments. The parties dispute the extent of Sabatini's knowledge of specific investments, although it is undisputed that Sabatini was aware of the Fast-Comm investments, discussed further below, and spoke with Amon about those investments in 1993 or 1994. Sabatini did not take any steps to ensure that investments of Plan assets would be diversified. A bond on the Plans was maintained from some point until 1995, when it was canceled for failure to renew the policy.

In December 1995, Sabatini telephoned Barbara Murray of Witman, Stadtmauer & Michaels, counsel for the Plans, and requested that she establish new employee benefits plans in his name. Murray then sent to Amon, for his execution, amendments to the Plan documents that would change the names of the Plans to the Thomas G. Amon, Esq. Pension and Profit Sharing Plans, and remove Sabatini as a trustee of the Plans effective retroactively to January 1, 1995. Amon executed the amendments at some point, but did not advise Sabatini that he had done so. Sabatini did not learn that he had been re-

moved as trustee of the Plans until March 1997.

Gray began working for Amon & Sabatini in 1990 after graduating from law school and was a participant in the Plans. He left the firm in 1994. In 1995, Gray contacted Sabatini and Amon by telephone in an effort to obtain his distribution from the Plans. After additional efforts in 1996 and 1997 in writing and by telephone, Gray received two checks from Amon on May 22, 1997.

Marciano also began working for Amon & Sabatini in 1990 and left the firm in March 1994. Between June 1994 and February 1997, Marciano contacted Sabatini numerous times to obtain his distribution from the Plans. Sabatini replied that Marciano's interest in the Plans needed to be calculated before a distribution could be made. In March 1997, Marciano began to call Amon to receive his distribution. On or about July 9, 1997, Marciano received a check from Amon.

### 2. The FastComm Stock Purchases

On November 11, 1992, Briggs purchased 1000 shares of FastComm for the Profit Sharing Plan at a price of $3.6250 per share. On March 22, 1993, Briggs made an additional purchase of 150 shares of FastComm stock for $7.75 per share. It is undisputed that Sabatini had access to the monthly account statements from Janney that included this purchase, as well as all other purchases of stock, on behalf of the Plans. Sabatini was also aware in 1992 that Amon acted as counsel to Fast-Comm at that time, and did not express any concern to any of the defendants that Amon's dual role as trustee and counsel represented a conflict of interest. Over the next nine months, the value of Fast-Comm stock fluctuated substantially, reaching a high of $14.75 per share on September 24, 1993. On December 10, 1993, Briggs purchased 2000 additional FastComm shares for $11.3125 per share. By June 24, 1994, the value of FastComm stock had fallen to $5.75 per share. On July 12, 1994, Briggs purchased 500 additional FastComm shares for $4.75 per share. The parties dispute whether Briggs made these purchases at the direction of Amon or in his own discretion.

In December 1994, Amon was appointed to serve on FastComm's Board of Directors. He then recused himself from all decisions regarding the Plans' investments in FastComm, and notified Sabatini and Briggs of his recusal. Amon received options to purchase 10,000 shares of Fast-Comm stock every year beginning at that time.

On February 21, 1997, Sabatini wrote to Briggs concerning the FastComm stock:

> With respect to the investment in Fast-Comm stock, I request that you hold our present position in the stock but keep me regularly advised of changes in its price. Due to the apparent conflict of interest resulting from Tom's position in the company, I believe we should be out of the stock by the end of the year.

To date, no instructions have been given to Briggs to sell the Plans' FastComm stock.

### 3. The Marcum Stock Purchases

On January 19, 1993, Briggs purchased 500 shares of stock in Marcum Natural Gas Services Corporation ("Marcum") for $7.75 per share. Basil Briggs, defendant Briggs' brother, sat on Marcum's Board of Directors beginning in July 1991 and throughout the period at issue. At the time of the purchase, Basil Briggs held stock options for 50,000 Marcum shares as well. The parties dispute whether Briggs disclosed Basil Briggs' presence on Marcum's Board prior to purchasing the Marcum shares. Briggs asserts that he disclosed it to Amon prior to the purchase; Amon testified that he learned of Basil Briggs' position only after receiving a letter from Sabatini's former counsel in April 1997. Amon further testified that "[h]ad [he] known [Basil Briggs] was on the board of directors of Marcum, I would have looked at the company." Sabatini

knew nothing about Basil Briggs' position on the Board of Directors until 1997.

On March 3, 1993, Briggs sold the Marcum shares at a profit for $9.75 per share. On July 12 and November 8, 1994, Briggs purchased a total of 18,000 Marcum shares for $4.625 and $3.25 per share, respectively. As with Briggs' purchases of Fast-Comm stock, the parties dispute whether Briggs acted with Amon's prior approval or in his own discretion. The value of the Marcum stock decreased steadily from that time.

### 4. The Transfers of Plan Assets

By facsimiles dated October 17, 1996, and January 13, 1997, bearing handwritten signatures above the signature lines for both Amon and Sabatini, Janney was directed to transfer $10,000 on each occasion from the Plans' account to a Marine Midland Bank account held in the name of Amon & Sabatini. While Briggs asserts that he believed that Sabatini's signatures on the two letters were genuine, Sabatini denies signing the two facsimiles or sending any information concerning the Marine Midland account to Briggs or Janney. Both transfers were made as requested by Briggs and Janney on October 17, 1996, and January 14, 1997, respectively. Sabatini asserts that he did not learn of the October 1996 transfer until February 1997, and of the January 1997 transfer until some time thereafter.

Amon distributed checks for $7,198.80 and $722.55 to David Norman on April 30, 1997. It is undisputed that these amounts constituted Norman's full interest in the Plans. Amon retained $1,978.69, which he remitted to the Internal Revenue Service as withholding taxes for Norman. In May 1997, Amon wrote two checks to Gray from the Marine Midland account for $4810.39 and $818.66 to cover his full interest in the Plans. In June 1997, Amon directed Janney to make several distributions to Marci-

ano of his full interest in the Plans. In addition, on June 15, 1997, Amon paid $4,588.31 and $916.63 back to the account at Janney from which he had transferred the $20,000 originally. Those checks covered the difference between the distributions made to Norman and Gray and the transferred funds, and the interest earned on those funds while in the Amon & Sabatini account at Marine Midland, respectively. In total, Amon paid $21,034.03 to cover distributions to Gray and Norman, taxes, interest, and return of funds to the Janney account. Amon declined to answer questions concerning the withdrawals at his deposition, invoking his right against self-incrimination under the Fifth Amendment to the Constitution.

### DISCUSSION

The plaintiffs' complaint alleges that the defendants breached their fiduciary duties to the Plans by purchasing and holding the FastComm stock in order to secure and maintain Amon's position on FastComm's Board of Directors; by purchasing and retaining Marcum stock despite, or because, Briggs' brother sat on that company's board; and by transferring the two $10,000 transfers to the Amon & Sabatini account allegedly for Amon's personal use. In addition, the plaintiffs now assert that the defendants breached their fiduciary duties by failing to diversify the Plans' investment portfolio and by trading excessively with Plan assets to generate commissions. The complaint includes causes of action under both Section 404 and Section 406 of ERISA,[1] but the complaint does not make clear which factual allegations support which causes of action.

After addressing the admissibility of Lau's expert testimony, the Court will first address the plaintiffs' claims under Section 406, and then those under Section 404. For the purpose of clarity, the Court will address all claims concerning the $10,000

---

**1.** The complaint also alleges that the defendants violated Sections 104(b)(2) and (4) and 502(c) by failing to provide information and

documents to the plaintiffs upon their request. The Court dismissed these claims in an Opinion dated July 7, 1998.

transfers together at the conclusion of this Opinion.

### 1. The Proper Standard

Summary judgment is only appropriate when the submissions of the parties, taken together, "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of "informing the court of the basis for its motion," and identifying those portions of the pleadings and other submissions which it believes demonstrate the absence of a genuine issue of material fact. *Fed'l Deposit Ins. Corp. v. Giammettei*, 34 F.3d 51, 54 (2d Cir.1994), citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When deciding a motion for summary judgment, a court must "view the evidence in a light most favorable to the non-moving party and draw all reasonable inferences in its favor." *American Casualty Co. of Reading, Pa. v. Nordic Leasing, Inc.*, 42 F.3d 725, 728 (2d Cir.1994).

When the moving party has met its burden under Rule 56(c) of the Federal Rules of Civil Procedure, a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Fed.R.Civ.P. 56(e); *accord Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525–26 (2d Cir. 1994). A "bald assertion" that is completely unsupported by evidence is not sufficient to overcome a motion for summary judgment. *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir.1991). If no rational fact finder could find in the non-movant's favor, there is no genuine issue of material fact, and summary judgment is appropriate.

See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### 2. Lau's Report

The testimony of an expert is properly admitted where it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. To qualify as an expert, a witness must possess sufficient "knowledge, skill, experience, training, or education." *Id.* Put another way, the Court must decide "whether this particular expert [has] sufficient specialized knowledge to assist the [Court] in deciding the particular issues in the case." *Kumho Tire Company, Ltd.*, —— U.S. ——, 119 S.Ct. 1167, 1178, 143 L.Ed.2d 238(1999) (internal quotation omitted). A trial court has broad discretion to exclude expert testimony for its lack of helpfulness or for the expert's lack of qualifications, and shall only be reversed for "an abuse of discretion." *Id.* at 1176; *Slaven v. Mee Noodle Shop & Grill, Inc.*, No. 96 Civ. 0374, 1998 WL 661477, * 2 (S.D.N.Y. Sept. 24, 1998). Expert testimony which states a legal conclusion must be excluded. *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir.1994).

Plaintiffs' expert, Robert Lau, submitted a report and was deposed by the defendants. The defendants assert that Lau lacks sufficient knowledge of and experience with ERISA to qualify as an expert in this case. The plaintiffs respond that Lau's expertise lies principally in the securities industry, which allows him to provide critical testimony concerning the defendants' failures in investing and managing the Plans' portfolio.

The Court agrees with the plaintiffs that Lau's expertise lies in the securities industry, and that this expertise could be quite helpful in determining how a reasonable investor would have managed the Plans' portfolio differently. Unfortunately, his report barely touches upon this valuable area. Instead, it focuses almost exclusive-

ly on the defendants' breaches of (1) specific provisions of ERISA and (2) the rules of the NYSE and NASD. Specifically, with respect to ERISA, Lau opines that Amon violated ERISA by failing "to provide the required documents, reports and information to participants in the Plans," a claim that the Court dismissed in any event; by investing in FastComm in order to obtain valuable options as compensation for being a director; and by withdrawing the two $10,000 sums for "his own use." Lau then asserts that Briggs and Janney "must be held liable for Amon's acts in violation of ERISA," regardless of whether these defendants were fiduciaries to the Plans. This first area, ERISA itself, is clearly outside of Lau's expertise, is presented without sufficient factual support, and is dominated in any event by improper legal conclusions. From his deposition and resume, it is clear that Lau has had no education or even informal training in ERISA, and virtually no personal professional experience with its requirements. As a result, the bulk of his report falls outside any expertise he holds. In addition, Lau's analysis of the defendants' conduct in this section of the report amounts to little more than a string of legal conclusions unsupported by careful factual analysis and more appropriate to an attorney's summation. Thus, even if such conclusions rested on Lau's expertise, which they plainly do not, they would have to be excluded in any event because they constitute an "attempt [ ] to substitute the expert's judgment for the [Court's]." *Duncan*, 42 F.3d at 101.

■ With respect to the securities allegations, Lau's report includes an extensive analysis of securities industry rules that Lau claims the defendants violated. Attempting to demonstrate the relevance of such an analysis to this case, he states that

[s]ince NYSE and NASD rules and regulations are intended for the protection of customers of member firms, their violation is indicative of noncompliance with ERISA's requirements that investment

decisions be made prudently in the sole interest of participants and beneficiaries.

This is a valiant effort that fails only because Lau gives virtually no attention to the critical question before the Court—how would a reasonable investor of a pension plan have managed the Plans' portfolio and the specific investments at issue in this case?—and provides minimal support for the few conclusions that would otherwise be relevant. For example, Lau repeatedly concludes that the defendants violated securities rules by investing the Plans' assets "in a high concentration of unsuitable, speculative securities," but fails to provide any support for this conclusion through detailed discussion of specific investments, comparative analysis, or other means. Instead, Lau offers a list of investments that he deems "not suitable for the Plan[s]" without any explanation or elaboration. Of these investments, Lau says only that

[t]he interests of participants and beneficiaries of ERISA Plans are best served through the ownership of good quality growth stocks held for a lengthy period of time.

Without the requisite expertise in managing plans governed by ERISA, such conclusions are not helpful.

■ Amon objects specifically to the relevance and reliability of Lau's proffered opinion that Amon violated ERISA by investing in FastComm to obtain options as compensation for his work as a director. Amon argues that it is undisputed that FastComm had no policy requiring its directors to own stock in the company, and Lau admitted that he was aware of no "facts" supporting his opinion on this question. The Court agrees that Lau's testimony and report would offer little to the Court's analysis.

As articulated in his report and a supplemental declaration submitted in response to this motion, Lau's opinion on this issue may be summarized as follows. Based on his experience "look[ing] at pub-

lic filings over a period of many years" and his "involve[ment] in the appointment of directors," Lau asserts that it is common for companies to require that their directors purchase a stake in the company. From this common practice, Lau concludes that Amon used the Plans' assets to purchase and retain FastComm stock in order to secure and maintain a valuable position on the FastComm Board of Directors.

There is no basis in the record for Lau's conclusion that Amon used the Plans' assets for his own gain. Lau admitted at his deposition that he could not point to any facts that supported his conclusion. Although Lau explains that he was simply referring to his inability to "know with absolute certainty what was in [Amon's] mind," it is clear that Lau's opinion rests on nothing more than strained speculation. Neither Lau nor the plaintiffs dispute that FastComm did not have a policy, whether written or oral, requiring its directors to purchase a stake in the company. There is no evidence that anyone at FastComm even knew of the Plans' purchases of its stock prior to Amon becoming a director. It is also undisputed that Amon recused himself from all decisions with respect to the Plans' FastComm holdings after he became a director. Amon's recusal undermines the otherwise unsupported conclusion that Amon held the Plans' FastComm holdings through the stock's decline in value in order to retain his position as a director. Accordingly, Lau's report and testimony on this point will not assist in the determination of this matter as it finds no support in the record.

█ On the question of diversification (¶ 9), Lau presents three computations of the percentage of the Plans' portfolio invested in either FastComm or Marcum.

On the question of excessive trading (¶ 10), Lau provides a list of trades that he asserts demonstrate that Briggs and Janney used Plan assets to generate commissions for themselves at the expense of the interests of the Plans. He opines that this trading violated an NASD rule prohibiting "churning." While these analyses are rudimentary, they stand out as the only areas in which Lau's expertise and the issues to be decided in this case converge. In sum, with these two exceptions, the Court will exclude Lau's expert testimony because he lacks the qualifications to express the opinions for which his testimony is offered, the opinions are inadmissible because they constitute bare legal conclusions, or they are without sufficient evidentiary basis to be either reliable or helpful to the Court.

### 3. Prohibited Transactions Under Section 406

Briggs and Janney argue that the claims against them under Section 406 must fail because there is no evidence of any prohibited transactions in this case. Plaintiffs have not opposed this portion of the summary judgment motion. Although Briggs and Janney asserted in their original moving papers that they cannot be considered fiduciaries of the Plans, they have since withdrawn that argument for summary judgment, except with respect to their role in the two $10,000 transfers of Plan assets. The Court finds no evidence of a prohibited transaction that would implicate Briggs and Janney in this case, and no genuine issue of material fact that would preclude summary judgment on these claims.

Plaintiffs' claims arise under three subsections of Section 406: §§ 406(a)(1)(D),[2] 406(b)(1),[3] and 406(b)(3).[4] In order to vio-

---

**2.** Subsection (a)(1)(D) provides:
A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect ... transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan.
29 U.S.C. § 1106(a)(1)(D).

**3.** Subsection (b)(1) provides:

A fiduciary with respect to a plan shall not deal with the assets of a plan in his own interest or for his own account.
29 U.S.C. § 1106(b)(1).

**4.** Subsection (b)(3) provides:

late Section 406(a)(1)(D), a transaction must involve a transfer of plan assets to a party in interest. *Liss v. Smith,* 991 F.Supp. 278, 293 (S.D.N.Y.1998). A "party in interest" is defined, in pertinent part, as any fiduciary of a plan, "a person providing services to such plan," or a "relative" of any such fiduciary or person. 29 U.S.C. § 1002(14). A "relative" is defined as "a spouse, ancestor, lineal descendant, or spouse of a lineal descendant." 29 U.S.C. § 1002(15). The transactions covered by Section 406(a)(1) "are per se violations of ERISA regardless of the motivation which initiated the transaction, the prudence of the transaction, or the absence of any harm arising from the transaction." *Reich v. Polera Bldg Corp.,* No. 95 Civ. 3205, 1996 WL 67172, * 2 (S.D.N.Y. Feb. 15, 1996).

■ Section 406(b) "protects beneficiaries by prohibiting transactions tainted by a conflict of interest and thus highly susceptible to self-dealing." *Lowen v. Tower Asset Management, Inc.,* 829 F.2d 1209, 1213 (2d Cir.1987). Good faith is not a defense to violations of this provision and liability must be imposed "even where there is no taint of scandal, no hint of self-dealing, no trace of bad faith." *Id.* (internal quotation omitted).

### A. The FastComm Investments

■ The plaintiffs allege that the defendants made the FastComm investments to obtain or maintain Amon's position on FastComm's board of directors and to enhance the value of the FastComm stock options Amon received in connection with that position. With respect to Section 406(a)(1)(D), it is undisputed that Amon is a "party in interest" and that the FastComm investments were made with assets of the Plans. Although it is not specified in the complaint, the "transaction" alleged is presumably Amon's use of Plan assets

for his own benefit through the purchases of FastComm shares.

The Court finds no genuine issue of material fact in dispute that would prevent summary judgment with respect to the FastComm purchases. The purchases at issue were completed over four months before Amon became a FastComm director, and the plaintiffs have failed to provide any evidence that those purchases bore any relation to Amon receiving that position. Similarly, the plaintiffs have failed to link the purchases in any way to the value of the stock options obtained by Amon long after those purchases were made. It is also undisputed that Amon recused himself from all decisions concerning FastComm stock held by the Plans after he became a director. In short, the FastComm purchases did not breach Amon's duty of loyalty to the Plans. Briggs and Janney cannot be held liable, therefore, for effecting these transactions under Section 406(a)(1)(D).

In essence, the same analysis applies to Sections 406(b)(1) and (b)(3). There is no evidence that the FastComm purchases were made in the interests of Briggs or Janney or for any of their own accounts. The plaintiffs do not even allege that these defendants received any consideration for their personal accounts in connection with those purchases.

### B. The Marcum Investments

■ In order to prove a violation of Section 406(a)(1)(D), the plaintiffs must provide evidence that assets of the Plans were transferred to, or used by, a "party in interest." It is undisputed that Basil Briggs is not such a party in interest. There is also no evidence in the record to suggest that any of the defendants stood to benefit financially or otherwise from the Plans' investments in Marcum. Similarly, the plaintiffs do not allege that the defendants received any consideration for their

A fiduciary with respect to a plan shall not ... receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

29 U.S.C. § 1106(b)(3).

own personal accounts in connection with the Marcum investments. For these reasons, the plaintiffs' claims under Section 406 based upon these investments are without support.

### 3. Fiduciary Duty Claims under Section 404

Briggs and Janney further seek summary judgment on the plaintiffs' claims under Section 404(a)(1), which governs fiduciary duties. Sections 404(a)(1)(A) and (B) require that

> [a] fiduciary must discharge his duties "solely in the interests of the participants and beneficiaries." He must do this "for the exclusive purpose" of providing benefits to them. And he must comply "with the care, skill, prudence, and diligence under the circumstances then prevailing" of the traditional "prudent man."

*Donovan v. Bierwirth,* 680 F.2d 263, 271 (2d Cir.1982) (quoting 29 U.S.C. § 1104).

■■■ Section 404(a)(1)(C) requires fiduciaries to "diversify[ ] the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." 29 U.S.C. § 1104(a)(1)(C). There is no *per se* violation of this Section, "as each case turns on its unique facts and circumstances." *Liss,* 991 F.Supp. at 301. Once the plaintiffs have established a prima facie case of failure to diversify, the burden of persuasion shifts to defendants to show that the investments at issue were nevertheless "clearly prudent" under the circumstances. *Id.* In order to determine whether the diversification requirement has been breached, the Court is to consider, to the extent applicable,

> (1) the purpose of the plan, (2) the amount of plan assets, (3) financial and industrial conditions, (4) the type of investment, (5) the distribution as to industries, and (7) the dates of maturity.

*Id.* (citation omitted).

Section 404(a)(1)(D) requires that fiduciaries discharge their duties "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D). Although the plaintiffs have alleged a breach of this Section, they have not identified any evidence that would indicate the manner in which the defendants have breached it. Accordingly, the Court shall dismiss the plaintiffs' claims under Section 404(a)(1)(D) as to all defendants.

■■■ Briggs' and Janney's motion for summary judgment on the plaintiffs' other claims under Section 404(a)(1) must be denied for the most part because substantial issues of material fact remain unresolved. Briggs and Janney argue principally that the plaintiffs cannot show that the purchases of FastComm and Marcum stock caused any losses to the Plans because either Sabatini or Amon could have chosen to sell those shares when they were valued highly instead of acquiescing in their steady decline in value without ordering Briggs to sell. This argument fails for two reasons.

First, the defendants misconstrue the causation element by ignoring that the plaintiffs have attacked not simply the isolated decisions to purchase the FastComm and Marcum shares, but the defendants' entire investment strategy and management of the Plans' portfolio. It is entirely irrelevant to whether the defendants breached their duties in this way that Sabatini or Amon could have sold the shares at a more profitable moment in time. If the defendants did not act prudently and for the exclusive purpose of benefitting the Plans in managing the Plans' portfolio, and their mismanagement included a failure to sell the shares before they hit rock bottom, then they are liable (along with their co-fiduciaries Sabatini and Amon) under Sections 404(a)(1)(A) and (B) if a reasonable investor would have produced a more profitable outcome. *See, e.g., Liss,* 991 F.Supp. at 295 (where allegations focus on pattern of investments and overall strategy, plaintiff must only show that a

reasonable investor's strategy would have profited the plan more than that of the fiduciary).

Second, the parties dispute numerous critical facts that would determine whether the investments in FastComm and Marcum satisfied the defendants' fiduciary duties. Among other things, the parties dispute whether Amon told Briggs to pursue an "aggressive growth" strategy of investments for the Plans' assets. Briggs himself testified that the Marcum stocks represented an "aggressive growth" investment, and acknowledged that Marcum had a history of substantial losses. Similarly, the parties dispute the extent of the defendants' investigation into these investments before they were made, as well as their diligence in monitoring the investments once made. These failures alone, if proven at trial, may constitute breaches of Section 404(a)(1). *See Liss,* 991 F.Supp. at 298 ("trustees must investigate proposed investments with regard to risk and return as well as appropriateness in light of the composition and aims of a fund['s] portfolio"). *See also* 29 C.F.R. § 2550.404a–1(b). In sum, the plaintiffs may be able to prove at trial that these investments, and their subsequent management by Briggs and Janney, demonstrate breaches of fiduciary duty to the Plans by not only Sabatini and Amon, but also Briggs and Janney.

### 4. The $10,000 Transfers

Even if evidence concerning the $10,000 transfers were admissible at trial, Briggs and Janney could not be found liable for these transfers under either Section 406 or Section 404 of ERISA. With respect to those transfers, Briggs and Janney were not fiduciaries. It is undisputed that a person who is not named as a fiduciary in a plan is a fiduciary only to the extent that he exercises discretionary authority or control over the assets of a plan. *See* 29 U.S.C. § 1002(21)(A). In addition, "a person may be a fiduciary with respect to certain matters but not others, for he has that status only 'to the extent' that he

has or exercises the described authority or responsibility." *F.H. Krear & Co. v. Nineteen Named Trustees,* 810 F.2d 1250, 1259 (2d Cir.1987). *See also* 29 C.F.R. § 2509.75–8 ("The personal liability of a fiduciary who is not a named fiduciary is generally limited to the fiduciary functions, which he or she performs with respect to the plan").

In this case, the transfers at issue bore no relation to the basis for Briggs' and Janney's fiduciary status, namely their provision of investment advice to the Plans. There is no evidence to suggest that Briggs and Janney held any discretion or authority over the disposition of the Plans' assets beyond that limited role. Although the agreement between the Plans and Briggs and Janney was not written, it is undisputed that Amon and Briggs orally agreed only that Briggs would provide investment advice and assistance. Nor was there any bar under the terms of the Plans to the transfer of assets out of the Plans' account into the Amon & Sabatini account. Briggs and Janney thus had neither discretion nor any basis to reject the trustees' requests for the two transfers to be made. Accordingly, they did not act as fiduciaries with respect to the $10,000 transfers. *Brandt v. Grounds,* 687 F.2d 895, 898 (7th Cir.1982).

Plaintiffs argue that Briggs knew or should have known that the transfers were improper. Assuming *arguendo* that the transfers were improper, there is no evidence in the record presented to support an inference that Briggs knew of the purpose of the transfers or of any improprieties in the requests when they were made. As a non-fiduciary with respect to the transfers of funds, moreover, Briggs had no duty to inquire further to ensure that the trustees were honoring their duties to the Plans by requesting the transfers. *Silverman v. Mutual Benefit Life Ins. Co.,* 138 F.3d 98, 103 (2d Cir.1998) (plan administrator had no duty of inquiry prior to releasing funds to trustee). With respect to the plaintiffs' claims under Section 404,

therefore, Briggs and Janney cannot be held liable as fiduciaries.

■ With respect to the plaintiffs' claims under Section 406—which the plaintiffs no longer press—Briggs and Janney could only be held liable if they participated in a prohibited transaction.[5] *Reich,* 1996 WL 67172, at \* 5. It is clear that a nonfiduciary defendant need not have had any intent to aid in the fiduciary's violation of his duties under ERISA to be held liable, for such intent is not required of the fiduciary himself. *Lowen,* 829 F.2d at 1213; *Reich,* 1996 WL 67172, at \* 2. It is less clear, however, whether the nonfiduciary need have known that the fiduciary was engaged in a prohibited transaction. In *Diduck v. Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 282–83 (2d Cir. 1992), the Court of Appeals held that

> [t]he relevant 'knowledge' for liability to attach for knowingly participating in a fiduciary's breach of duty is knowledge as to the primary violator's status as a fiduciary and knowledge that the primary's conduct contravenes a fiduciary duty.

Diduck addressed liability for breaches of Section 404, and not prohibited transactions under Section 406. One court in this district has found no such knowledge requirement in actions against nonfiduciaries for participation in prohibited transactions, reasoning that because the fiduciary's motivations are irrelevant, those of other participants need not be considered. *See Liss,* 991 F.Supp. at 306 n. 30. It cannot be disputed, however, that the nonfiduciary, like the fiduciary, must have known or should have known at least what actually occurred, if not that it was prohibited. Any other application of the statute would render the nonfiduciary participant more prone to liability than the fiduciary, a re-

sult not intended by Congress. Briggs and Janney thus could be liable as nonfiduciaries only for their *knowing* participation in the transfers of assets. In this case, that would require, at a bare minimum, evidence that Briggs knew what happened to the transferred funds after the transfers were completed.

As discussed already, there is no evidence in the record to suggest that these defendants knew or should have known the purpose or ultimate destination of the transfers. Indeed, Amon's requests for the transfers showed no signs of impropriety and, at least with respect to Briggs and Janney, could not have been denied without encroaching on the legitimate powers of the trustees to withdraw assets for occasional disbursements to beneficiaries. Even assuming the transactions to be prohibited, therefore, Briggs and Janney cannot be held liable for these transfers. In sum, Briggs' and Janney's motion for summary judgment on the plaintiffs' claims related to the two transfers is granted.

■ Instead of moving for summary judgment on any claims related to the $10,000 transfers, Amon has moved to preclude evidence concerning the transfers at trial. The plaintiffs do not challenge the defendants' motion with respect to their claims under Section 406 of ERISA. The question before the Court, therefore, is whether the plaintiffs' proof at trial of breaches of fiduciary duty under Section 404 should include evidence concerning the $10,000 transfers.

Amon reasons that there is no legal reason for this evidence to be admitted because the plaintiffs seek no damages based on these transactions. The complaint does not include an articulated prayer for damages for the transfers. As a

---

**5.** It appears that a nonfiduciary "party in interest" may also be held liable to disgorge any benefit received from a prohibited transaction under Section 406(a)(1)(D). *See Lockheed Corp. v. Spink,* 517 U.S. 882, 889 n. 3, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996). There is no allegation in this case, however,

that Briggs or Janney was a party in interest with respect to the two transfers or that they received any benefit from them. Thus, the Court shall only address the alternative basis for nonfiduciary liability under Section 406, namely for "participation" in a prohibited transaction.

result, Amon argues that the plaintiffs seek to introduce this evidence simply to prejudice the Court's consideration of Amon's conduct. While the plaintiffs do not abandon their claims based on the transfers, they are unable to identify what damages they would be able to recover if these claims stood alone at trial. Still, the plaintiffs argue that such evidence is admissible to impeach Amon's credibility or, through Rule 404(b), Fed.R.Evid., to elucidate Amon's intent with respect to the Plans.

The transfers occurred several years after the alleged violations of ERISA that form the basis for the plaintiffs' claims of loss, namely the Marcum and FastComm purchases. The transfers bore no relation to those purchases or to the investment strategy adopted for the Plans by Amon and/or Briggs. Nor do the plaintiffs dispute that Amon was authorized to withdraw the funds without obtaining Sabatini's signature or consent. In addition, the plaintiffs cannot point to any loss suffered by the Plans as a result of the transfers. In short, the transfers are entirely unrelated and distinct in time and substance from the transactions that support the plaintiffs', and the defendants', claims for damages.

Moreover, the plaintiffs' claims under ERISA do not require proof of willfulness, and good faith is not a defense to claims under either Sections 404 or 406. *Lowen v. Tower Asset Management, Inc.,* 829 F.2d 1209, 1213 (2d Cir.1987) (prohibited transactions); *United States v. Mason Tenders District Council of Greater New York,* 909 F.Supp. 882, 888 (S.D.N.Y.1995) (fiduciary duties). Accordingly, Amon's intent with respect to the Plans is almost entirely irrelevant to the resolution of this case and evidence of the same would not be probative of any fact that would be of consequence to such resolution. Proof of the transfers would not shed light either on whether Amon's conduct with respect to the investment of the Plans' assets occurred as the plaintiffs allege, or on wheth-

er such conduct ran afoul of ERISA. The transfers are entirely dissimilar to the conduct underlying the Marcum and Fast-Comm investments. *See United States v. Affjehei,* 869 F.2d 670, 674 (2d Cir.1989) ("Similarity, being a matter of relevancy, is judged by the degree in which the prior act approaches near identity with the elements of the offense charged.") (internal quotation omitted). Accordingly, the Court finds this evidence to be inadmissible under Rule 404(b).

The Court also finds such evidence inadmissible under Rule 403, Fed.R.Evid. To prove the entire course of conduct relating to the transfers would require considerable effort, yet would provide little of use to the Court in resolving the material issues concerning investment of the Plans' assets. Any minimal probative value of evidence of the transfers is substantially outweighed by the undue delay and wastefulness that the admission of such evidence would present.

▆ Nor would evidence concerning the transfers be admissible to impeach Amon's credibility at trial. Under Rule 608(b), Fed.R.Evid., extrinsic evidence of a witness's conduct may not be admitted to attack his credibility. While it may be a legitimate line of inquiry on cross examination, therefore, the plaintiffs cannot introduce extrinsic evidence concerning the transfers for this purpose. In sum, the Court finds that evidence concerning the two transfers is irrelevant to the resolution of the parties' claims and thus shall not be admitted at trial.

### 5. Briggs' and Janney's Counterclaims

▆ Briggs and Janney, "in the event that their summary judgment motion is denied, move in the alternative for summary judgment with respect to their cross- and counterclaims." Briggs and Janney have asserted a cross-claim against Amon and a counterclaim against Sabatini, both for "contribution and/or indemnification" for any judgment entered against them. The Court cannot grant summary judg-

ment on these claims for several reasons. The parties dispute numerous issues of material fact, including, among other things, the validity of Sabatini's removal as a trustee of the Plans retroactively to the beginning of 1995, the extent of the diversification problem; and the existence of some form of bonding for the Plans. In addition, the numerous disputed issues of material fact that preclude summary judgment on the plaintiffs' claims against Briggs and Janney under Section 404 similarly preclude summary judgment on their claims against Sabatini and Amon. In particular, the reasonableness of the fiduciaries' management of the investment portfolio remains in dispute.

### CONCLUSION

For the reasons set forth above, Briggs' and Janney's motion for summary judgment is granted in part and denied in part. Specifically, summary judgment is granted to Briggs and Janney on the plaintiffs' claims under Sections 406 and 404(a)(1)(D) of ERISA, but denied as to the plaintiffs' claims under Sections 404(a)(1)(A), (B), and (C). Amon's motion to preclude evidence concerning the two transfers of assets is granted. The defendants' motion to preclude Lau's testimony is granted, except the Court finds admissible testimony reflected in paragraphs 9 and 10 of his report. Further proceedings in this case shall be governed by the scheduling order issued with this Opinion.

SO ORDERED.