Barth David SCHWARTZ, Plaintiff,

v.

FORTUNE MAGAZINE, a division
of Time, Inc., Defendant.

No. 98 CIV. 7444(RLC).

United States District Court,
S.D. New York.

March 2, 2000.

Parker, Chapin, Flattau & Klimpl, LLP, New York, for Plaintiff; Lee Henig Elona, of counsel.

Time Inc., General Counsel's Office, New York, for Defendant; Paul G. Gardephe, Deputy General, Milton L. Williams, Jr., Assistant General Counsel, of counsel.

## OPINION

ROBERT L. CARTER, Senior District Judge.

This case is before the court on plaintiff Barth Schwartz's motion for a new trial. Plaintiff's breach of contract claims against defendant FORTUNE magazine were tried before this court in a four-day trial, beginning November 30, 1999. A more detailed rendition of the trial facts is set out in this court's prior opinion on this matter, *Schwartz v. Fortune Magazine*, 89 F.Supp.2d 429 (S.D.N.Y.1999) (Carter, J.), familiarity with which is assumed.

Plaintiff asserts five bases for the motion: (1) the trial court's erroneous exclusion of parol evidence; (2) errors in the court's evidentiary rulings; (3) errors in the court's special verdict form; (4) the court's prejudicial demeanor; (5) and the court's bias against him. For the reasons stated below, plaintiff's motion for a new trial is denied.

## I. Analysis

"A motion for a new trial may not be granted unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done." *Metromedia v. Fugazy*, 753 F.Supp. 93, 96 (S.D.N.Y.1990) (Carter, J.) (citations and quotations omitted). The moving party

bears the burden of showing that he is entitled to a new trial. *See id.*

### (1) Parol Evidence

■ Plaintiff contends that the court's ruling preventing him from admitting parol evidence regarding the interpretation of ¶ 32 of the contract barred him from effectively making his claim. (Pl. Mem. at 9).[1] The court declined to admit parol evidence in this case because both parties agreed that the disputed contract was a "valid and enforceable legal agreement," (Joint Pre–Trial Order at 7), and both offered the same unambiguous interpretation of ¶ 32. *See Garza v. Marine Transport Lines,* 861 F.2d 23, 26 (2d Cir.1988). Specifically, ¶ 32 reads

> "This agreement may be terminated by either party with 30 days written notice. However, you shall complete any section projects you have been assigned before the contract termination will take effect."

Both parties urged that ¶ 32 be read to require plaintiff to finish the advertising sections he had been assigned if the contract was terminated. (Pl. Trial Mem. at 10–12) *Cf.* (Def. Trial Mem. at 13–16). The dispute at trial was (1) whether this obligation could properly be terminated by defendant's cancellation of the special advertising sections plaintiff was assigned by acting under ¶ 17 of the contract[2] and/or (2) whether the facts showed that FORTUNE had in fact canceled the advertising sections under ¶ 17 and discharged plaintiff of his duty to finish the sections. (Tr. 6–7 & 352, 496) (plaintiff arguing that ¶ 17 could not discharge plaintiff's duty under ¶ 32, and alternatively that defendant's rights under ¶ 17 were not exercised); (Tr. 32–33) (defendant arguing that once advertising sections were canceled under ¶ 17 plaintiff was no longer required to work on

assigned sections). Because it was clear that the parties had no dispute about the meaning of ¶ 32's terms, and that the paragraph was unambiguous, the court concluded that there was no basis to admit parol evidence. (Tr. at 26–29, 30–31).

### (2) Evidentiary Rulings

■ Plaintiff contends that Lee Cunningham's testimony about other FORTUNE magazine independent contractors' sales records and the revenue they generated selling special advertising sections should have been excluded because the testimony was irrelevant. (Pl.Mem.7–8). The court concluded that Cunningham, as an account executive in FORTUNE's custom advertising department, could offer relevant testimony about the volume of special advertising section sales during the period plaintiff contended he would have worked under the contract, and she could testify about the amount of work required to sell FORTUNE's special advertising sections. This evidence was relevant because it rebutted plaintiff's damage estimates. (Tr. at 341–42, 335–41) (plaintiff claiming he would have sold 24 advertising sections in a 5–6 year period). Cunningham's testimony was used to show that plaintiff's projected damages estimates were substantially higher than what was indicated by the sales performance of other FORTUNE independent contractors. (Tr. 407, 440–441).

■ Relatedly, plaintiff argues that the court should have admitted his damages evidence about his successful sales performance at Scientific American magazine, on the ground that his past sales record was probative evidence regarding his possible sales performance at FORTUNE. (Pl. Mem. at 8). At trial, witnesses from Scientific American indicated that Scientific American is a

---

1. Pl. Mem. refers to *Plaintiff's Brief in Support of His Request for a New Trial* filed December 16, 1999. Def. Mem. refers to *Defendant FORTUNE's Memorandum of Law in Opposition to Plaintiff's Motion for a New Trial,* filed January 28, 2000. Def. App. Ex. refers to the Exhibits attached to the *Appendix to Defendant FORTUNE's Memorandum of Law in Opposition to Plaintiff's Motion for a New Trial,* filed January 28, 2000. Tr. refer to the November 30, 1999, trial transcript.

2. Paragraph 17 reads,

> "After FORTUNE has approved a section topic of publication, FORTUNE will not cancel the section unless there are no advertising orders in connection with the section. If your efforts to sell a section produce no advertising orders, then the section will be canceled and FORTUNE shall have no further obligation to you and you shall have no further obligation to FORTUNE in connection with that section topic."

smaller magazine, with lower priced advertising and a smaller readership, and that it faces more challenges in securing high profile advertising clients who would be interested in advertising with FORTUNE. (Tr. at 36–37, 48–51). The court concluded that plaintiff's success in selling advertising sections for Scientific American, therefore, could not be used to show how successful plaintiff would have been at selling advertising sections for FORTUNE Magazine. (Tr. at 45).

██ Plaintiff argues that the court should have excluded testimony about his job performance while at FORTUNE and the reasons for his termination because this evidence was irrelevant and prejudicial. The aforementioned evidence was relevant under Federal Rules of Evidence 401 and 402 because it was probative rebuttal evidence countering plaintiff's damages evidence. Plaintiff contended that he would have continued to work for FORTUNE until the year 2003, and that he would have sold 24 advertising sections. (Tr. at 341–42, 335–41). Defendant introduced rebuttal evidence showing that plaintiff would not have made these sales because he had alienated FORTUNE's foreign representatives and foreign customers. The evidence was more probative than prejudicial under Rule 403 because, although it painted defendant in a bad light, it did not invite the jury to make a decision based on emotion or other unfair basis. All the evidence did was assist the jury in determining whether plaintiff's damage claims were supported by the evidence.

██ Plaintiff also contends that the court improperly barred his damages expert from testifying about the amount of commissions plaintiff would have earned had he continued to work for FORTUNE under the August 1, 1997, contract. (Pl. Mem. at 10). Plaintiff's expert, Heidi Muckler, is an accountant; Muckler conceded that her area of expertise was in making calculations of the net worth of parties involved in divorce proceedings.

(Tr. 327–330). Muckler's testimony in this case merely consisted of calculating the commissions plaintiff would have earned had he continued to work for FORTUNE. The court recognized that this testimony was not generated based on any specialized knowledge, but rather involved basic calculations. (Tr. at 332–333). Therefore, it was proper to exclude Muckler's testimony under Rule 702 as "unhelpful." *See Gray v. Briggs*, 45 F.Supp.2d 316, 323 (S.D.N.Y.1999)(Cote, J.).[3]

### (3) Special Verdict Form

██ Plaintiff contends that the special verdict form denied him a fair trial because verdict form Question 1(a) raised issues plaintiff never contested at trial: namely, whether FORTUNE had the right to terminate the advertising sections plaintiff was assigned.[4] (Pl. Mem. at 5). Plaintiff contends that this question improperly focused the jury's attention on ¶ 17 of the contract, the section cancellation provision, whereas his claim only required the jury to determine whether FORTUNE terminated the contract properly under ¶ 32, the contract's pre-termination provision. *See Cutlass Prod., Inc. v. Bregman*, 682 F.2d 323, 327 (2d Cir.1982).

Contrary to plaintiff's assertion, he did raise the claim during trial that FORTUNE did not have the right to terminate the special advertising sections he was assigned once he had begun working on the sections. (*See, e.g.*, Pl. Trial Mem. at 5, 12–13); (Tr. 6–7 & 352, 496). Even if plaintiff did not intend his claim to raise a question about defendant's authority to cancel sections, the defense's theory was that its cancellation of the advertising sections was authorized under ¶ 17. This was a valid defense theory, and defendant submitted evidence in support of the theory; therefore, defendant was entitled to submit a special verdict question inquiring about this issue. *See Cutlass*, 682 F.2d at 328–29.

---

**3.** Additionally, it is clear that plaintiff suffered no prejudice from this ruling, as plaintiff's counsel elicited the same damages testimony by asking plaintiff about his expected commissions. (Tr. at 335–341).

**4.** Question 1(a) was "Do you find that plaintiff Schwartz has proven by a preponderance of the evidence that FORTUNE was not permitted under the August 1, 1997 contract to cancel the special advertising sections it had authorized Schwartz to pursue as shown by the evidence in this case?"

Plaintiff also claims that the court compromised his right to a fair trial because the special verdict form withdrew one of his theories of the case from the jury's consideration, *see Ajax Hardware Man. Corp. v. Ind. Plants Corp.*, 569 F.2d 181, 187 (2d Cir.1977), namely, "whether plaintiff was given the opportunity to complete the 30 assigned sections" he was allocated in accordance with the contract terms. (Pl. Mem. at 6). In this case, plaintiff's counsel submitted a special verdict form that did not outline her specific theories of liability, (Def.App.Ex. I.) (copy of plaintiff's proposed special verdict sheet), and she opposed defendant's special verdict form on the ground that she did not want specific questions about her breach of contract theories submitted to the jury. (Tr. 474–75, 519–20). The record shows that plaintiff never alleged that the special verdict form did not include one of her theories of the case in the conference before the jury retired; therefore, she waived her right to raise this objection post trial. *See Tuttle v. Equifax*, 190 F.3d 9, 15 (2d Cir.1999).

Plaintiff asserts that the jury found the special verdict form confusing because after three hours of deliberation, it asked for clarification about the order in which the special verdict questions were posed. (Pl. Br. at 6); *Cf. Cann v. Ford Motor Co.*, 658 F.2d 54, 58–59 (2d Cir.1981) (noting that a verdict sheet that confuses the jury about the standard of liability requires a new trial). The trial record shows that the jury initially believed that the order of the special verdict form questions prevented them from considering the case in its entirety; they perceived that if they answered no to Question 1(a), concerning the alleged breach of the contract's section cancellation provision, they could not proceed to Question 2(a), concerning defendant's alleged breach of the contract's pre-termination notice provision. (Tr. at 522–525). The court, however, informed the jury that Questions (1)(a) and (2)(a) were to be considered independent of each other, and it further allowed the jury to reorder the questions in the manner they felt would be appropriate. (Tr. at 523–25). The jury foreperson twice indicated that this would solve the problem. (Tr. at 525.) The jury's verdict further indicates that the jury considered plaintiff's two breach of contract theories separately, as it concluded that plaintiff had only prevailed on his claim that FORTUNE breached the contract's pre-termination notice provision. (Tr. at 530).

### (4) Prejudicial Demeanor

Plaintiff alleges that the court's "abusive," "impatient, condescending and hostile" manner when dealing with plaintiff and his counsel compromised his right to a fair trial. (Pl. Mem. 2–3). Specifically, plaintiff complains that the court almost always sustained defendant's objections. (Pl. Mem. at 2). However, one cannot prove bias merely by showing that a disproportionate number of rulings were made in favor of the opposing party. *See In re Int'l Bus. Mach. Corp.*, 618 F.2d 923, 929–30 (2d Cir.1980). In this case the court sustained defendant's objections when the objections were made on proper legal grounds. The record shows that defendant's objections were sustained when: (1) plaintiff's counsel questioned witnesses about irrelevant matters (*see, e.g.,* Tr. at 34); and (2) when plaintiff's counsel asked vague, improperly formed, and leading questions. (*see, e.g.,* Tr. at 202–204).

Plaintiff also complains that the court held his counsel to time limits. (Pl. Mem. at 2). However, both sides were held to the same time limits, and therefore these limits did not indicate that there was hostility toward either side. (*See, e.g.,* Tr. at 12) (warning plaintiff about time); (Tr. at 23) (warning defendant about time). The court did admonish plaintiff's counsel on occasion for failing to present her evidence in an efficient manner.[5] (*See, e.g.* Tr. at 235) (criticizing plaintiff's counsel for failing to appropriately prepare her witness); however, it also corrected defense counsel when they made similar errors. (*See, e.g.,* Tr. at 145–47) (criticizing defense counsel for failing to appropriately prepare exhibits); (Tr. at 327)

---

5. The court also admonished plaintiff for his behavior, because he talked over and interrupted the court, (Tr. at 228), and because he attempted to act as an advocate rather than merely testify about the facts of his case. (Tr. at 215–16).

(criticizing defense counsel for improperly formed voir dire questions).[6] It is clear that the jury did not perceive the court's behavior overall to be improper, as one juror submitted a letter to the court after the trial complimenting the court on how it ran the trial proceedings.[7]

### (5) Bias

[redacted] Plaintiff alleges that the court gave more favorable treatment to defense counsel Milton Williams, Jr. during the trial because his father, a New York state court justice in the First Appellate Department, has a relationship with the court. (Pl. Mem. 3–4).

I assume that this allegation concerning bias because of a relationship with Justice Milton Williams is based on the fact that during a pre-trial conference in the case the court asked the son how the father was, and told the son to give his father the court's best. *See Dee v. Inst. Networks Corp.*, 559 F.Supp. 1282, 1284 (S.D.N.Y.1983) (Cannella, J.) (explaining that one proves a violation under 28 U.S.C. § 455(a) by identifying "extrajudicial" facts supporting an inference of bias).[8] This was a mere courtesy—the court has no personal relationship with Justice Williams. Justice Williams, an African American, was a very prominent, highly regarded state judge long before his appointment to the Appellate Division. As a fellow African American, the court has reason to take pride in his accomplishments. It is doubtful, however, that the court has spent five minutes in Justice Williams's company or had a cup of coffee with him. The inquiry and message were merely gestures of respect for the judge.

On this dubious foundation, plaintiff has built a claim that possibly "race, religion, or gender ... impacted the court's ability to be neutral" towards him. (Pl. Mem. at 4). This is a particularly insulting charge to be made to this court and, of course, plaintiff has not and indeed could not identify any extrajudicial facts that would allow a reasonable person to infer that such bias existed.

## II. Conclusion

In summary, plaintiff has failed to identify any error in the court's rulings, much less show that a trial error affected one of his substantial rights. Based on these findings, plaintiff's motion for a new trial is denied. The court's prior opinion, *Schwartz v. Fortune Magazine,* 89 F.Supp.2d 429, entering judgment in favor of defendant FORTUNE and setting aside the partial jury verdict in favor of plaintiff, stands as the final judgment of this court.

**IT IS SO ORDERED**

[redacted]

6. Plaintiff also contends that the court stated that defendant had well proved that he was egotistical, and this comment indicated to the jury that the court was biased against him. (Pl. Mem. at 3). The court could not find this statement in the record. Even if the comment was made, it did not cast doubt on plaintiff's credibility or the merits of his claim, and therefore did not compromise his right to a fair trial. *See Rivas v. Brattesani,* 94 F.3d 802, 808 (2d Cir.1996).

7. The letter, a copy of which is in the court file, reads: Dear Judge Carter,

This has been a very rewarding experience. It was an honor and a privilege serving as a juror in your courtroom. You are an inspiration to us all.

8. Plaintiff fails to identify the legal basis for her bias claim, and the court treats the bias claim as a motion under 28 U.S.C. § 455(a). *See In re Int'l Bus. Mach. Corp.,* 618 F.2d 923, 932 n. 11 (2d Cir.1980) (explaining that failure to prove bias under § 455 indicates that a party's Fifth Amendment due process claim of bias would also fail).